CAMPBELL, Acting Chief Judge.
Appellant, Todd Michael Gaffney, raises two issues in challenging his judgment and sentence for aggravated battery. We affirm.
The two issues raised by Appellant are:
I. Whether the trial court erred in denying Appellant’s request for the standard jury instruction on self-defense in the use of nondeadly force?
II. Whether the trial court erred in instructing the jury that Appellant had a duty to retreat?
We find that the record discloses that Appellant’s counsel specifically agreed to the instruction he now complains of in his second issue and we will address that issue no further. We also conclude from the record that the evidence adduced at trial did not support any instruction on self-defense. Appellant was tried by a jury on a charge of attempted second degree murder. The jury returned a verdict of guilt *359 on the lesser included offense of aggravated battery.
The victim in this case was Gina Com-párate, Appellant’s live-in girlfriend. Neither Ms. Compárate nor Appellant testified at trial, and the record does not explain why Ms. Comparato was not a witness at trial. The victim’s sister, Marie Russell, also lived with the couple. At trial, Ms. Russell testified that the victim borrowed her car on October 8, 1997 to visit a friend, Judy Williams. When she returned the following day, she appeared ill and lay down on the couch. Ms. Russell left to run errands, and called several times to check on her sister, but never received an answer. When she returned home at approximately 3:00 p.m., Appellant was outside attempting to get a broken key out of the ignition of his vehicle. Ms. Russell went into the house and discovered her sister in the bedroom unable to move, with a swollen face, and gasping for breath.
Ms. Russell went outside and confronted Appellant who told her that he and the victim had been in a fight. He stated that he did not want to call a doctor so he placed a bag of ice on the victim’s head. Ms. Russell then went to seek help. When she returned, Appellant was sitting on the floor, crying, saying to himself, “Why did you do this? You love her. How could you let it go this far? If we get through this, I promise I’m going to make it up to you.”
Appellant refused to open the door when a police officer arrived. The sheriffs department was summoned and the house was surrounded by law enforcement. Appellant opened the door and said the victim was sick and could not be disturbed.
Three law enforcement officers testified that they responded to the call and knocked on Appellant’s door without response. The armed officers surrounded the home and Appellant eventually came out of the house. The officers found the victim in the bedroom, her face black and blue, and her eyes swollen shut.
Richard Wheeler, the paramedic who treated the victim, testified that she was lifeless with shallow breathing, her eyes were purple and swollen shut, and she had numerous bruises and abrasions. The victim indicated that she hurt everywhere and that she had been beaten.
Dr. John Moore, the general surgeon who provided medical care to the victim, testified that she had contusions on her face, arms, and body; cuts on her forearms and scalp; a broken rib; and a basal skull fracture. The victim’s injuries were consistent with someone who had been struck at least two times and were inconsistent with someone who had fallen.
Officer Glisson testified that he tape recorded Appellant’s statement made after Appellant was informed of his rights. Appellant’s taped statement was offered into evidence by the State and played for the jury. The statement is as follows:
OFFICER GLISSON: Okay. With this in mind, by the way, I’m Investigator Glisson of the Davenport Police Department. I failed to introduce myself. Todd, I would like for you to go ahead at this point and tell me what happened involving this domestic violence case.
MR. GAFFNEY: Well, she’d been gone for two, three days. I guess I didn’t pay attention to her. I had been sleeping and working on my truck. I’d been broke down for several weeks. And she took off and left a couple of days ago, and just out of the blue she got mad. I guess I wasn’t paying enough attention to her. Then when she left she was cussing and raising cane (sic), and I worked on my truck last night and got to sleep about daybreak this morning and she decided she’d come home, she’d been gone a couple of days. So she decided she’d come home and she couldn’t wait for her sister to leave there. And that’s just how she is.

She started in on me. She come in there, I was asleep on the waterbed, I toas asleep. She jumped up on the bed 
*360
and she pulled the covers off, raising hell about where I was, what I was doing. Then she picked up a big wad of keys and hit me upside the head with them. She hit me in the eye with them. She gave me a black eye with the keys, I believe, or it feels black anyway.

So I mean I just — I just come up right out of bed, I come up swinging. I’d asked her two or three times to leave me alone and she wouldn’t do it. When she hit me with the keys, I was (inaudible), the wad of keys there.
OFFICER GLISSON: Okay. You say you came up swinging, what did you come up swinging with?
MR. GAFFNEY: Just my open hand.
OFFICER GLISSON: Your open hand?
MR. GAFFNEY: Yes, sir.
OFFICER GLISSON: Do you know any particular spots or any spots on her body that you struck her?
MR. GAFFNEY: No, sir, I just — like I said, you know, it all happened so quick, and I just — when I come up swinging, I wasn’t worried about where I hit. You know, just trying to get — she hit me with the keys and that was it. That ivas the final straw. I mean I just — I didn’t really care. I was just swinging at anything the first time. I was half asleep really.
OFFICER GLISSON: Okay. We keep referring to she, would you tell me who she is and what she is to you, girlfriend, wife, or so on and so on?
MR. GAFFNEY: Yes, sir. She’s my girlfriend, Gina. Gina Christine Compárate. She’s my girlfriend maybe a year or so.
OFFICER GLISSON: Okay. Y’all have lived together for a while?
MR. GAFFNEY: Yes, sir.
OFFICER GLISSON: Have you got any idea about how long, Todd?
MR. GAFFNEY: Well, like I said, about a year or two. Maybe two and a half, that’s only a guess.
MR. GAFFNEY: We both need counseling. We’ve got to have it or we won’t make it, we just will not make it. I mean I want the relationship to work. I mean I’ll tell you something. What I did this morning was out of true reflex. I was sleeping, I mean — I mean, it just — and was sound asleep, pretty sound, and I’m like a tiger when I wake up, if somebody wakes me up wrong. There’s just no excuse for the way she ivoke me up this morning, the way she did it. I mean she jumped in the bed, she pulled the covers off, she was trying to get me up and once she hit me with the keys, I mean I got a wad of keys at the house, I mean they’re a wad this big. And they’re on a spongy cord. I know when she come down and hit me with them things.
And when she hit me, I don’t believe she meant to, but like I didn’t really mean to, really, I honestly didn’t mean to really hit her, if you want to know the truth. And I don’t believe she really meant to hit me either. It just — it was all so quick. And it was all over with. I mean it ivas just -
OFFICER GLISSON: Okay. Did she— did you seek any medical attention for her at all?
MR. GAFFNEY: Yes, sir I did. Yes, sir.
OFFICER GLISSON: When?
MR. GAFFNEY: Right — about an hour after it happened, when I seen, you know, when it first happened, you— there was no visible signs.
OFFICER GLISSON: Where did you seek the medical attention at, or did you just do it yourself?
MR. GAFFNEY: I done it myself.
OFFICER GLISSON: You didn’t call no emergency medical technician?
MR. GAFFNEY: No, I asked her if she wanted me to, and she said no. I guess she — well, she told me she didn’t want none. I mean I was a medic for eight years in the military. I did what I could *361 do, you know, for her, anyway, as far ice pack and everything else.
OFFICER GLISSON: Has she offered or suggested to leave the house at any time today?
MR. GAFFNEY: No, sir. No, sir. She has not. She — she hasn’t been forced to stay whatsoever. She’ll tell you. She’ll say it, she will tell you she’s not — we— we could have either one left after all that was over. And she told me no, she wasn’t going to leave. And I said, well, I’m not going to leave, you know, we done screwed up here big time. I mean we did, just a screw up is all it was. Ain’t nothing much — it shouldn’t have happened, it just should not have happened.
OFFICER GLISSON: Okay. I don’t know if we picked it up or not, but could you give me a general idea and the time that this occurred and the location?
MR. GAFFNEY: Yes, sir. It happened at 6 East Pine Street, in the master bedroom, and I’m just guessing, at approximately 9:30 this morning, 9:00. And like I said, I was sleeping and after it all happened, I ain’t no more paid attention to time than the man in the moon.
But I just saw her — I was — I saw her head and it swelled — it all started to swell. I mean she — she’s always been like that, you know, she swells easy. And I hope the Good Lord, I mean I pray to the Good Lord she’s all right. I mean really I-
OFFICER GLISSON: Okay. No kids or nobody else was around at the time this occurred?
MR. GAFFNEY: No, sir, not a soul. See, she waited till her sister — see she, she waited till her sister got gone before she come in there. Now, that’s how she’ll do. She’s always been like that. She don’t’ want nobody to see the fights that she picks with me. She would never own up to it anyway. It ain’t (inaudible) She knows, she waited till right after she left, I believe, and I’m guessing that too, because I was sleeping. And according to Marie, when she came back, she left about that time. And she come in there and started in on me.
OFFICER GLISSON: Okay. You’re fully giving me this statement in reference to this violence case that- — and it occurred on your own free will, and nobody has threatened or coerced you to make these statements?
MR. GAFFNEY: No, sir, nobody has threatened or coerced me.
OFFICER GLISSON: And you feel like you acted out of what?
MR. GAFFNEY: Self-defense entirely.
OFFICER GLISSON: Self-defense.
MR. GAFFNEY: I mean I don’t know how I got to be the suspect and her, like what is it you called it?
OFFICER GLISSON: She’s the victim.
MR. GAFFNEY: Okay. Well, can’t it be reversed?
OFFICER GLISSON: It can be — it can go both ways. But at this point it has to be handled like this till -
MR. GAFFNEY: All right. I understand.
OFFICER GLISSON: All right. Well, you fully understood your rights, and as I stated before, nobody has coerced you or threatened to do bodily harm or anything, you give this statement on your free will and understood your Miranda warnings?
MR. GAFFNEY: Yes, sir, I do. (Emphasis added).
It is clear that only at Officer Glisson’s prompting did Appellant claim he acted in self-defense. His statement does not support a self-defense charge but instead indicates he acted out of anger and on sudden impulse. The charge Appellant requested was Florida Standard Jury Instructions in Criminal Cases 3.04(e), Justifiable Use of Nondeadly Force. That charge provides in pertinent part as follows:
(Defendant) would be justified in using force not likely to cause death or great *362 bodily harm against (victim) if the following two facts are proved:
1. (Defendant) must have reasonably believed that such conduct was necessary to defend [himself] against (victim’s) imminent use of unlawful force against the [defendant].
2. The use of unlawful force by (victim) must have appeared to (defendant) ready to take place. (Emphasis supplied).
Not only does the charge require that the victim’s unlawful force, if any, must appear to be “ready to take place,” it also requires that it be “imminent.” “Imminent” is defined in The American Heritage Dictionary of the English Language, New College Edition 658 (8th ed.1979), as “about to occur.” Whatever Ms. Compara-to’s actions were toward the Appellant, they had already occurred when he attacked her and inflicted severe injuries by repeatedly striking her. Nearly directly on point is Nunez v. State, 542 So.2d 1061 (Fla. 3d DCA 1989). There, the court held:
First, we conclude that the trial court correctly refused to instruct the jury on self-defense because, simply stated, there was insufficient evidence adduced below to support such an instruction. The sole evidence at trial on the issue was the testimony of a police detective who stated that the defendant made an oral statement to the police that, “ T stabbed the victim in self-defense.’ That he was assaulted by group of males.” Plainly, this evidence was nothing more than an assertion of self-defense by the defendant and in no way explained the exact circumstances upon which the assertion was based. This being so, the trial court was not required to instruct the jury on self-defense based solely on the defendant’s bald assertion of self-defense. See Smiley v. State, 395 So.2d 235, 236 (Fla. 1st DCA 1981); Bolin v. State, 297 So.2d 317, 319 (Fla. 3d DCA 1974).
542 So.2d at 1062.
Affirmed.
FULMER and SALCINES, JJ., Concur.